J-S66015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: E.W.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.S., BIRTH MOTHER | No. 784 WDA 2017 |

Appeal from the Order Entered May 2, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-11-2017

BEFORE: BENDER, P.J.E., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:               **FILED December 1, 2017**

B.S. ("Mother") appeals from the order entered on May 2, 2017, in the Court of Common Pleas of Allegheny County, Orphans' Court Division, which involuntarily terminated Mother's parental rights to her minor son, E.W.E. ("Child") (born in August of 2015), pursuant to sections 2511(a)(2), (a)(5), (a)(8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] After careful review of the record and applicable law, we affirm.

The orphans' court provided the following relevant factual history of this case in its Pa.R.A.P. 1925(a) opinion:

> Jessica Andrews (hereinafter, "Ms. Andrews"), a caseworker for [Allegheny County Office of Children, Youth, and Families ("OCYF")], testified that Child came to the attention of OCYF on the day he was born because Mother was active with

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] On February 17, 2017, E.W.E., Sr. ("Father") voluntarily signed a consent to the adoption of Child and termination of his parental rights to Child. The orphans' court confirmed Father's consent by order of court dated May 1, 2017.

OCYF "off and on" since about the year 2000[,] when her oldest child was born…. On August 12, 2015, an Emergency Custody Authorization was obtained because Mother had other children who were dependent and in foster care. OCYF filed a Petition to Terminate Mother's Parental Rights and a hearing was scheduled.[3] Child has not returned to Mother's care since his birth.

> [3] Mother's parental rights were also terminated to two of her older children. One of Mother's other children's cases closed via a Subsidized Permanent Legal Custodianship (SPLC) Order.

On August 17, 2015, a Shelter Hearing was held and this court determined that "[M]other has another child scheduled for a [Termination of Parental Rights hearing]. [Mother] has not addressed the issues in that case and they are the same issues in the current case. While [Child] was still in the hospital, the people at the hospital noticed parenting deficits with both parents and contacted OCYF."

On September 18, 2015, Child was adjudicated dependent pursuant to the Pennsylvania Juvenile Act at 42 Pa.C.S. § 6302(1). Per the Adjudicatory Order, the court made the following findings of fact: "Mother stipulates that based on her other children's cases, the [c]ourt can find [Child] to be dependent. Mother also stipulates that she needs assistance with anger issues…."

Child was placed in foster care with his maternal aunt (hereinafter, "Foster Mother"), where he has remained throughout the history of this case.

OCYF created a Family Plan which listed the following goals for Mother: 1) to obtain mental health treatment; 2) to visit regularly and consistently; 3) to work with In-Home Services; and 5) [sic] to comply with the Protection from Abuse order (hereinafter "PFA") she obtained against Father.

Orphans' Court Opinion (OCO), 7/11/17, at 3-4 (citations to record omitted).

On February 8, 2017, OCYF filed the underlying "Petition to Terminate Mother's Parental Rights to Child." On May 1, 2017, the court terminated Mother's parental rights to Child, pursuant to 23 Pa.C.S. § 2511(a)(2),

(a)(5), and (a)(8). The court also ruled that termination of Mother's parental rights was in the best interest of Child, pursuant to 23 Pa.C.S. § 2511(b).

Mother timely filed a notice of appeal on May 31, 2017, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother now raises the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that [OCYF] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5.

We review an appeal from the termination of parental rights under the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re: R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia*

> ***Motors America, Inc.***, … 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***
>
> As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, … 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re S.H.***, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

- 4 -

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decrees pursuant to sections 2511(a)(2) and (b), which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the

- 5 -

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

Moreover, this Court has previously stated:

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *In re A.S.*, 11 A.3d 473, 481 (Pa. Super. 2010).

In the instant matter, Mother argues that she complied with the Family Plan goals established for her by OCYF and asserts that she remedied any parental incapacity related to her ability to care for Child. Mother's Brief at 14-15. However, the record clearly belies Mother's claims. The following is the orphans' court's explanation of Mother's Family Plan goals and its analysis regarding Mother's efforts, or lack thereof, to reach each of these goals:

Mother had a goal of mental health because OCYF had "records of Mother's long, complicated mental health history." Ms. Andrews testified that "there were a number of things, as well as reports from the evaluations … that all seem to indicate that there was an ongoing need for some mental health treatment." In terms of meeting her mental health goal, Mother started mental health treatment with Family Services of Western Pennsylvania. Mother informed OCYF that she completed her treatment there, however, Ms. Andrews was never provided with documentation confirming Mother's assertion. Mother also attended mental health treatment at Mercy Behavioral Health. Ms. Andrews explained that with regard to Mother's therapy "the

pattern has been that she would go for a couple of months and then stop going and then go again for a couple months and then stop going."

Visitation was a goal for Mother because Child was removed from her care. Mother's goal to regularly visit with Child inherently included a parenting component and to specifically address this goal, Mother worked with Project STAR[5], ACHIEVA[6], and Highland Family Support Center.[7] Project STAR provided in-home services which addressed parenting. Colleen Sokira (hereinafter, "Ms. Sokira"), the in-home manager for ACHIEVA, oversees the parenting education program "which is a program whose focus is to work with adults with intellectual disabilities, who are parenting or learning to parent their child…." Ms. Sokira's services are "**specifically geared towards parenting the child [when] the parent is a person with an intellectual disability.**" As stated previously, **Ms. Sokira was familiar with Mother because she was working with Mother and Child's older sibling … for years prior to Child's birth**.

[5] Project STAR is licensed by the Pennsylvania Department of Public Welfare as an adoption, foster care and private children and youth social service agency. Project STAR is an affiliate member of the Statewide Adoption and Permanency Network (SWAN) and maintains contracts with local, statewide and out-of-state counties in the areas of placement services and family preservation/reunification services.

[6] ACHIEVA is a nonprofit parent organization that has comprehensive services and supports and serves thousands of individuals with disabilities and their families each year.

[7] Highland Family Support Center provides services to assist individuals with life skills, parenting help, support groups, counseling, parent-child groups, and in-home services.

Mother's visitation schedule consisted of supervised visitation on Tuesdays for four hours and Fridays for two hours. Mother was entitled to thirty minutes of unsupervised time with Child. Ms. Andrews testified that Mother did not always respond to Child's needs and did not always do "those things that [*sic*] would typically do with a one-and-a-half-year-old."

Mother also had a goal of working with in-home services provided by Project STAR which also included a parenting component.

Mother's compliance with the PFA she obtained against Father was a goal because there were allegations of a history of domestic violence between them. Ms. Andrews testified that Mother "reported that there were some arguments, and at one point that he had like spit on her, and that he had made threats that he was going to kill the kids…." Mother completed a domestic violence program at the Hope Center.

While Mother was compliant in some regard to her goals, she has failed to make adequate progress and cannot or will not remedy the conditions that existed which led to the removal of Child in a reasonable amount of time.

OCO at 5-7 (citations to record omitted) (emphasis added in original).

After an extensive review of the evidence presented at the May 1, 2017 termination hearing, the court went on to conclude that "Mother does not have the capacity to parent Child[,] because she has not consistently obtained mental health treatment or followed direction from the hours of parenting support she has received." *Id.* at 7. In reaching this conclusion, the court explained that it,

relied on the expert testimony of Dr. Patricia Pepe, Ph.D. (hereinafter, "Dr. Pepe"), a licensed psychologist and expert in the area of child psychology, as well as the testimony of Ms. Sikora[,] who provided years of support to Mother at ACHIEVA. Dr. Pepe first evaluated Mother in 2014 and admitted that Mother made some progress in 2015. However, Dr. Pepe opined that Mother "has not maintained the level of consistency or continuity that she would need to really gain a benefit from therapy and from mental health treatment in general."

**She has exhibited consistent poor judgment and she is a poor historian, often contradicting herself, and I think that part of the problem is in terms of her personality functioning, she tends to be narcissistic in that she views the world through her eyes and**

- 9 -

> **cannot understand other people's perceptions, which really makes it difficult to understand what her children need. So[,] that is often difficult and, unfortunately, through time, she's not been able to prioritize her children.**

Dr. Pepe believed that Mother's failure to consistently follow through with mental health treatment has affected her capacity to parent Child:

> I have, you know, time and time and time again recommended psychotherapy each time I had seen her. I recommended her involvement with a case manager to ensure her participation.
>
> **I have recommended her participation in psychiatric treatment, and based upon what … Mother has said, she's not been consistent with any of it.**
>
> …
>
> **I've seen the capacity for her to develop insight and to develop some degree of control if she would be consistent with therapy and consistent with mental health services.**
>
> **She just, unfortunately, has not been able to do so, which has certainly impacted her capacity … to develop and maintain stability and to exhibit parental responsibility.**

> Ms. Andrews explained that Mother's mental health also affected her parenting[,] because there continued to be concerns about Child's safety while in Mother's care. For example, Mother lets Child "walk around and eat" instead of using a highchair which is a choking hazard. Mother also did not remove toys from Child's Pack 'N Play "so when she needs to make a phone call or if she needed to take a shower or something, she wouldn't have a safe place for him to be…." Ms. Andrews testified that Mother did not consistently respond to Child's needs and did not always do "those things that [*sic*] would typically do with a one-and-a-half-year-old." Mother attended a few of Child's doctor's appointments; however, Ms. Andrews testified that there have been problems obtaining medical care for Child.

> …

Ms. Sokira was also concerned that Mother's home was not baby proofed. "It has been an issue in the home since we came in, especially for a mobile toddler, that there are steps that don't have baby gates on them. There are choking hazards that a toddler could easily swallow…. There are kitchen cupboards that a toddler can easily access." Ms. Sokira echoed Ms. Andrews' concern that Mother did not use a highchair and addressed that concern with Mother several times and "it took about a week … to get the highchair returned for him to be able to eat safely." However, Mother still had not cleared the Pack 'N Play even after Ms. Sokira urged her to do so because there was not a safe place for Child to be placed. Mother also removed safety latches that were placed on her kitchen cabinets because she thought they were too difficult to use.

Dr. Pepe also testified about considerable safety concerns:

[Mother] had difficulty with memory. She said she can't remember what she says and does and she couldn't remember yesterday. And she gave me an example that she forgot she left the stove on and went shopping and told me that she could have burnt her house down…. [S]he said she has blackouts and was expressing that she can't remember what she says or what she does or whatever people say or do.

OCO at 7-10 (internal citations to record omitted) (emphasis added in original).

Additionally, the court relied on the following evidence provided by OCYF, which further demonstrated Mother's struggles to progress with regard to her parenting skills:

Ms. Sokira testified that Mother refused to let Child self-feed because she didn't want Child to make a mess and Mother still "needs lots of verbal prompting and counseling on nutrition and appropriate food for [Child]…." Mother also still needed "frequent prompting for providing appropriate toys and appropriate verbal interaction." Ms. Sokira agreed with Ms. Andrews that Mother "does not respond to [Child's] cues the way that I would expect a parent to respond to the things that [Child] does…."

Ms. Sokira explained that Mother's responsiveness to direction was "dependent upon the day...." Mother was not always cooperative with services:

> Frequently, when verbal prompts are given, we get responses like, "**I know what I'm doing. Don't tell me what to do.**"

> When we attempt to do things like model, we get responses like, "**No one gets to play with my baby but me**...."

Ms. Sokira believed Mother needed to follow through with the mental health recommendations made so that she would understand how to parent Child safely[.]

OCO at 10-11 (citations to record omitted) (emphasis added in original).

Finally, the court opined that it:

> Finds it unsettling that Mother's visitation has not progressed past thirty minutes of unsupervised time[,] which Ms. Sokira attributes to Mother's "resistance" against establishing a routine. Ms. Sokira was not able to describe a typical visit because Mother's cooperation was not consistent and she "**hasn't followed through for more than two-to-three weeks at every given attempt.**" Ms. Sokira explained that routine is "important for the child's development and for the child's sense of normalcy … [a]nd second, **it's important for us to have an idea of what [Mother's] going to do next.**" Accordingly, ACHIEVA has not recommended more than thirty minutes of unsupervised time because "[i]**t's just simply not safe**."

*Id.* at 11 (emphasis added in original).

Based on the foregoing, the orphans' court concluded that "Mother's lack of progress in terms of mental health treatment and ability to follow direction exhibits a lack of capacity to parent Child and that she cannot or will not remedy the conditions which led to removal in a reasonable amount of time." *Id.* Accordingly, the court held that that OCYF met its burden under section 2511(a)(2) by clear and convincing evidence. After careful

review, we conclude that the court's determinations are well supported by the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but the focus is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the orphans' court concluded that it would be in Child's best interest for Mother's parental rights to be terminated. The court emphasized Mother's incapacity to parent Child and the lack of bond between Mother and Child. To the contrary, Mother argues that the court erred in terminating

her parental rights, as "[s]uch termination unnecessarily and permanently terminates the loving relationship between Child and Mother." Mother's Brief at 11. Mother further avers that Child has a bond with her and benefits from contact with her. *Id.*

Again, we conclude that the record supports the orphans' court's decision to terminate Mother's parental rights. The court stated that, in reaching its decision, it relied on the following testimony, which it found to be credible:

> On January 18, 2017, Dr. Pepe concluded an interactional evaluation of Mother and Child. Dr. Pepe observed Child's affect to be "very flat. There was just lack of emotion…. [H]e seemed to be familiar with her, but just unusually unemotional. He was blunted. There was no discernable facial expression. He certainly wasn't smiling." Dr. Pepe "**did not see an attachment…. [Mother] tried over and over to engage with him, but he remained very flat and, you know, was just trying to scoot away and did not exhibit primary bonding toward her**."

> Dr. Pepe conducted two interactional evaluations between Child and Foster Mother and observed a "dramatic difference." With Foster Mother, Child "was significantly more animated. He would approach her. He was smiling a big and bright smile…. He was happy…. She was positively responsive and he exhibited multiple bonding behaviors suggestive of a primary attachment toward her."

> Dr. Pepe explained that Foster Mother is Child's psychological parent "and if there's a separation after a significant process of bonding, then the child is at high risk for childhood depression, for developmental regression, for a multitude of problems, both currently and in the future." Dr. Pepe found "it to be in [Child's] best psychological interests to remain in his current home permanently through adoption."

> OCYF also was not of the belief that there is such a bond between Mother and Child[,] such that termination would be

- 14 -

detrimental to Child. Ms. Andrews testified that there is a "marked difference" between how Child acts with his Foster Mother versus his Mother. Ms. Andrews explained that if Child falls he does not look to Mother to comfort him and sooth him[,] but "when I'm at the home, if he trips and falls, if [Foster Mother] isn't right there to pick him up, he's running to her to be comforted." Ms. Andrews believed that Child is bonded with Foster Mother and will go to her "when he wants something or needs something or wants to play … or wants to be held…." Conversely, Mother "struggles with developmentally appropriate play and the child-centered activity."

TCO at 13-14 (citations to record omitted) (emphasis added in original).

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Mother, we conclude that the court did not abuse its discretion as to section 2511(b). *See S.P.*, 47 A.3d at 826-27. Accordingly, we affirm the order terminating Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/1/2017